IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CHARLES HAYDEN ELDER, Pro Se, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:14-CV-0026 |
| | § | |
| CAROLYN W. COLVIN, | § | |
|    Acting Commissioner, | § | |
|    Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**
**TO AFFIRM DECISION OF THE COMMISSIONER**

Plaintiff CHARLES HAYDEN ELDER, proceeding Pro Se, brings this cause of action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of defendant CAROLYN W. COLVIN, Acting Commissioner of Social Security Administration (Commissioner), who determined plaintiff was not disabled and denied his claim for benefits. For the reasons set out herein, the undersigned United States Magistrate Judge recommends the Commissioner's decision denying plaintiff's application for disability insurance benefits and social security insurance under Titles II and XVI of the Social Security Act be AFFIRMED.

I.
BACKGROUND

Plaintiff applied for disability insurance benefits and social security insurance in June of 2011, alleging he had been disabled since January[1] 15, 2009, due to anxiety, depression, and

---

[1] This date variously appears as January 15, 2009 and April 15, 2009. The ALJ utilized January 15, 2009 as the beginning date of plaintiff's claim period.

schizophrenia (Tr. 99-106, 136). After plaintiff's application for benefits was denied by the Commissioner, he requested a hearing before an administrative law judge (ALJ) (63), which was conducted October 16, 2012 by Administrative Law Judge Dan Dane (Tr. 22-39).

At the ALJ hearing, plaintiff was represented by counsel and testimony was received from plaintiff and from Ms. Ike, a Vocational Expert.

Plaintiff testified that he was not working but had last worked as a truck driver in January of 2009 (Tr. 24). He stated he was going to college at the time, but only for the purpose of getting the student loan money to live on and because it was good therapy for his mind (Tr. 25). Plaintiff said he did not work because he couldn't function under pressure and did not perform a stress-free or low-stress job because he had terrible mood swings (Tr.25). Plaintiff stated going to school was good for his concentration and his memory (Tr. 25). He said he did not find school stressful because he didn't worry about it and was making one D and three C's in his classes (Tr. 26).

Plaintiff testified he had been in and out of hospitals a lot in the last couple of years and had tried to commit suicide several times because he felt like a burden on society (Tr. 26). He said his past actions affected his ability to get a job. Plaintiff stated he had assaulted a police officer and lost his job when he got mad about Mexican truckers taking jobs (Tr. 27-28). He said he was drunk at the time (Tr. 28). Plaintiff said he had not been able to recover from losing that job and that he tried to commit suicide (Tr. 29). Plaintiff said he was bipolar so that sometimes he was depressed and sometimes he was manic (Tr. 30).

Plaintiff testified it was tough for him to keep his apartment clean, but that lately his roommate had helped him (Tr. 31). He said he did his own laundry, took out the trash, and picked up trash after "Adam." (Tr. 31). Plaintiff said he had the best friends he had ever had in his life and

got along with his mother, his grandparent, and his teachers, all of whom were "the greatest." (Tr. 31-32).

Plaintiff testified that, in 1997, while in middle school, he had taken a gun to school because he was involved in gangs (Tr. 31).

Plaintiff testified his ability to focus and concentrate was terrible and that he received extra help with his college work and extra time from the teachers (Tr. 32). He stated he was not using any illegal drugs (Tr. 32-33). He said he did not go to church because he was embarrassed about having assaulted a police officer (Tr. 32-33). Plaintiff stated he had not used methamphetamine since July 2001; cocaine, since January 2009; alcohol, since July 2010 (Tr. 33).

Plaintiff said that, at the time of the hearing, he was only taking prescription medications, Seroquel and Prozac (Tr. 34).

When asked why he felt he deserved to be on disability, plaintiff seemed to feel the only other alternative was prison, and said he would "rather face the death penalty than that, than go to prison." (Tr. 34).

The Vocational Expert (VE), Ms. Ike, testified that plaintiff's past relevant work was as a truck driver, which was medium, semi-skilled, SVP$^2$ 4 (Tr. 35).

The ALJ posed a hypothetical, asking the VE to assume a person 37 years old, with a high school education and some college courses not geared to increasing vocational skills, with no physical limitations, but who suffered major depression and had a diagnosis of major depression with a history of being in and out of psychological facilities, threatening suicide, taking overdoses and

---

$^2$SVP references Specific Vocational Preparation. An SVP of 4 requires more than 3 and less than 6 months of training to perform the job. Dictionary of Occupational Titles, Volume II at Appendix C.

then going to get his stomach pumped, that such a person has some moderate limitations in the ability to understand and remember detailed instructions; moderate limitations in ability to carry out detailed instructions; moderate limitations in the ability to work in coordination with or proximity to others without being distracted by them; has moderate limitations in the ability to complete a normal work day; moderate limitations in the ability to interact appropriately with the general public; and moderate limitations in the ability to accept instructions and respond appropriately to criticism; moderate limitations in the ability to respond appropriately to changes in the work setting; moderate limitations in the ability to set realistic goals or make plans independently of others; a person who is able to understand, remember and carry out detailed, but not complex, instructions; able to make decisions; able to concentrate for extended periods; and able to interact with others and respond to changes. The hypothetical person also had a history of significant drug abuse, but had been clean for the past three years and could pass drug screen testing. The ALJ then asked whether such a hypothetical person could perform the work that plaintiff had performed in the past. (Tr. 36-37).

The VE responded yes, that such a person could perform as a truck driver (Tr. 37).

Plaintiff's counsel was allowed to pose questions to the VE, and asked if the same hypothetical person had marked limitations in the areas of setting realistic goals, responding appropriately to changes in the work setting, and accepting instruction and criticism, would that erode the vocational base or prevent the hypothetical person from doing his past relevant work (Tr. 38). The VE responded that, if areas such as accepting instructions and responding to criticism or changes to the work place were markedly limited, it would be difficult for such a person to retain a job (Tr. 38).

Plaintiff was briefly re-examined by his attorney and testified that he had previously been

diagnosed with paranoid schizophrenia, but said that was a long time ago, in 1991 or 1992 (Tr. 38-39).

Plaintiff's medical records show he was hospitalized July 17, 2009 for an overdose and was retained at Acadia Healthcare until July 27, 2009, when he was discharged to return home. Plaintiff's discharge diagnoses were "Axis I: Depression not otherwise specified. History of polysubstance abuse. Axis: II Deferred. Axis III: No disorder. Axis IV: Moderate. Axis V: Global Assessment of Functioning admission 30-35, discharge 48." Plaintiff was discharged on the following medications: Zoloft, 50 mg. 1 a.m.; BuSpar 10 mg. 1 t.i.d. p.r.n.; Valium 5 mg. 1 q.4-6 hours p.r.n." (Tr. 198-205). The preliminary treatment plan was to admit plaintiff to the adult unit, administer the prescribed therapies, and perform an internal medicine evaluation. (Tr. 206).

Plaintiff was treated at Cogdell Family Clinic for right carpal tunnel syndrome, left ulnar nerve entrapment, an unknown tremor, a right shoulder injury, and influenza, from October 2009 through August of 2010. (Tr. 207-213).

Plaintiff received episodic mental health care from August 2010 through July 19, 2011 (Tr. 220-284).

A Psychiatric Review by consultative physician Dr. Charles McDonald at West Texas Centers for MHMR assessed plaintiff's condition from January 15, 2009 through August 9, 2011 (Tr. 267-283) and noted plaintiff suffered from affective disorders and anxiety related disorders (Tr. 267) and suffered an affective disorder, MDD, which did not precisely satisfy the diagnostic criteria (Tr. 270), as well as mild OCD (Tr. 272). Doctor McDonald found plaintiff to have a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; no episodes of decompensation. Doctor

McDonald also assessed plaintiff's ability to remember locations and work-like procedures as not significantly limited, his ability to understand and remember detailed instructions as moderately limited, with moderate limitations or not significantly limited ability of sustained concentration and persistence (Tr. 281-282), no significant to mild limitations on his social interaction abilities, and no significant limitations on his ability to adopt to changes in work settings, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places and the ability to set realistic goals or make plans independently of others (Tr. 281-282).

A September 6, 2011 medical summary of plaintiff by a consultative physician noted only non-severe impairments. (Tr. 285).

Plaintiff was given another consultative Psychiatric Review by a second medical consultant, Susan Posey, PsyD., on January 10, 2012. (Tr. 293-309). There was no significant difference between her findings and those earlier reached by Dr. McDonald. Dr. Posey concluded that plaintiff was somewhat limited by dysthymia, but the impact of his symptoms did not wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis. She noted his functional limitations were less than marked and the alleged severity and limiting effects from the impairments were not wholly supported. (Tr. 309).

In December of 2011, plaintiff was admitted to Big Spring State Hospital for psychiatric care because he reported feeling he was a danger to himself (Tr. 312-337). After a week during which he was assessed and his medications were changed, plaintiff was diagnosed as suffering rapid cycling Bipolar II or a disorder in the Bipolar Spectrum and borderline personality trait. Plaintiff was discharged with his new medication and notations that he should be seen by his mental health advisor every two weeks for a month or so and then seen monthly thereafter until he is proven to be

stable and functional. (Tr. 336-337).

Plaintiff's attorney also submitted medical records from a March 12, 2012 admission to Acadia Healthcare showing plaintiff's admitting diagnosis was Major Depressive Affective Disorder Recurrent EP (Tr. 338). Plaintiff was discharged to his home on March 15, 2012 after completing the program (Tr. 339). Plaintiff's medication was adjusted and he participated in the program, working on improving his coping skills. At the time of discharge, plaintiff was noted as having no suicidal ideation (Tr. 339). This episode was followed by an August 2012 admission during which plaintiff threatened to kill himself if he did not receive a diagnosis as bipolar. Plaintiff was discharged on August 27, 2012, refusing to sign his paperwork and refusing his medication (Tr. 339-379).

In his opinion, the ALJ reviewed plaintiff's testimony that he was able to live independently and perform his household chores, drive, and go out alone. He noted plaintiff had a history of conflict with others but now had no trouble with authority, had friends, was enrolled in college, and got along with friends and family. While plaintiff had moderate difficulty with concentration, persistence or pace, he had not experienced an episode of decompensation of extended duration. (Tr. 13).

The ALJ noted plaintiff's history of depression and personality disorder (Tr. 14) and referenced plaintiff's April 2011 medication overdose due to anxiety and his Emergency Room intake and release the next day (Tr. 14). Plaintiff's follow-up care showed that in May of 2011, plaintiff stated he was sleeping well, with no side effects from his medication, and that the medication was helping his conditions and he was doing pretty well. Plaintiff was found to be

oriented in all spheres, with stable mood, and was assigned a GAF[3] of 65 at that time. (Tr. 15). The ALJ documented that in July of 2011 Plaintiff again reported he was doing "okay," that he was noted to be well-groomed with normal speech and sleep pattens, with normal thought process and content, fair insight and judgment, and good eye contact and appropriate affect. (Tr. 15, 232-233).

The ALJ also noted plaintiff's November 2011 consultative exam, and the fact that plaintiff drove himself to the exam. Plaintiff was found to be cooperative, his thought process to be goal directed, coherent, and logical. Plaintiff was oriented in all spheres, diagnosed with dysthymic disorder and assigned a GAF of 61, indicating some mild symptoms. (Tr. 15).

The ALJ further noted the reviews of plaintiff's records by Dr. McDonald, Dr. Posey, and a Dr. Hewitt (in September 2011) (Tr. 285), and a Dr. Ward in July 2011 (Tr. 311). The ALJ noted that both Dr. Hewitt and Dr. Ward determined that plaintiff did not have a severe physical impairment (Tr. 15). He found Dr. Posey's opinions to be persuasive and afforded them great weight. He also found Dr. Ward's opinion deserved great weight and noted plaintiff had not alleged a physical impairment and the medical evidence did not show he had one (Tr. 15).

The ALJ acknowledged plaintiff had some functional loss, and found plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms of occasional depression and manic mood, difficulty keeping his apartment clean, and trouble focusing (Tr. 14). The ALJ further found, however, that plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms not to be credible to the extent that they are inconsistent with the residual functional capacity assessment made by the ALJ (Tr. 14). That is, the ALJ found plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with

---

[3] GAF stands for Global Assessment of Functioning, a scoring system for the severity of mental illness utilized in psychiatry.

the nonexertional limitations of being limited to semi-skilled work with non-detailed tasks and instructions, with only superficial contact with the public and restricted to working alone rather than with others the majority of the time. (Tr. 13). The ALJ then analyzed plaintiff's claim using the five-step sequential evaluation process (Tr. 11-12). At step one the ALJ found plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. 12). At step two, the ALJ found plaintiff's impairments of depression and anxiety to be medically severe (Tr. 12). At step three, the ALJ determined plaintiff's severe impairments did not meet or equal the requirements for presumptive disability under the listed impairments in the regulations (Tr. 12-13). The ALJ found plaintiff's subjective complaints were not credible to the extent alleged (Tr. 13-16). The ALJ determined plaintiff retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with the non-exertional limitations of doing semi-skilled work with non-detailed tasks and instructions, superficial contact with the public, and working alone most of the time (Tr. 13). He determined plaintiff had the ability to perform the above residual functional capacity for a forty hour work week for an indefinite period of time.

At step four, the ALJ determined plaintiff had the residual functional capacity to return to his past relevant work as a truck driver (Tr. 16). Plaintiff was 38 years old on the date of the ALJ decision (Tr. 99). He was attending college at that time (Tr. 24-26).

The ALJ terminated his review of plaintiff's claim at step four. The ALJ found plaintiff was not disabled for the period from January 15, 2009 through December 14, 2012, the date of the ALJ decision, and denied his claims for benefits on December 14, 2012 (Tr. 7).

The Appeals Council denied plaintiff's request for review of the ALJ's decision on November 29, 2013, leaving the ALJ's decision to stand as the Commissioner's final decision. (Tr.

1-3). The federal lawsuit, based on 42 U.S.C. § 405(g), followed.

## II.
## ISSUE PRESENTED

By his complaint, plaintiff merely stated his mental state prevented him from being able to support himself and he has twice been denied benefits even though he feels he is due disability insurance.

By his August 14, 2015 Brief in which he was to set forth the errors in the ALJ's decision, plaintiff identified the following "issues":

1. Plaintiff was mis-diagnosed by a series of mental health care providers at least through May of 2013.

2. At his January 24, 2014 exam, plaintiff was determined to be disqualified from a commercial driver's license due to daytime sleepiness, schizophrenia, shortness of breath, and the results of his vision test. Plaintiff argued he suffered from Schizotypal and Paranoid Personality Disorders, that he should never have been given a commercial driver's license because he suffered road rage, and that "the information the ALJ had to determine [plaintiff's] disability was very poor information . . . . [and relied] on information from doctors [plaintiff had] never met, a Physician's Assistant that [plaintiff] argued with constantly, and the doctors [plaintiff] had met on the Judge's information were too quick to diagnose." Plaintiff said no psychological tests were ever administered.

3. At West Texas A&M University, plaintiff visited the counseling department where his counselor, Orvie Nix, and a Dr. Avirett have diagnosed Schizotypal Personality Disorder and Paranoid Personality Disorder. Plaintiff points out the costs of caring for the mentally ill in the prison system.

4. Plaintiff states his Schizotypal and Paranoid Personality Disorders make it impossible for him to provide for himself, his family can no longer take care of him, and he has his diagnoses and copies of commercial driver's license disqualification to show he qualifies for benefits.

By his September 29, 2014 reply brief, plaintiff asserted he had no evidence to support his claim of mis-diagnosis when he appeared before the ALJ and only received such evidence in the fall

of 2014 at West Texas A&M University. Plaintiff states the defendant claims plaintiff has schizophrenia, but he actually has schizotypal personality disorder. By his June 4, 2015 Brief, plaintiff informs the Court on May 29, 2015, he was diagnosed with kerataconus and his eyesight is 20/400. Plaintiff says he may become unable to drive and the only treatment is a corneal transplant. Plaintiff attaches a copy of the Medical Examination Report disqualifying him from a commercial driver's license and a copy of his Psychological Evaluation from West Texas A&M University Student Counseling Services.

### III.
### STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings and whether any errors of law were made. *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989). Substantial evidence in the context of Social Security determinations "is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993). Provided that the correct legal standards are applied, when "substantial evidence supports the [Commissioner's] findings, they are conclusive and must be affirmed." *Id.*

### IV.
### MERITS

The ALJ found plaintiff not disabled at Step 4 of the sequential evaluation process.

"The claimant has the burden of proving his disability and the ALJ has a duty to fully develop the facts, or else the decision is not supported by substantial evidence." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citing *Pierre v. Sullivan*, 994 F.2d 799, 802 (5th Cir. 1989) (*per curiam*)).

A finding of impairment must be supported by medical signs and/or laboratory findings that show a medically determinable impairment is present. 20 C.F.R. § 404.1529(b). A claimant's "symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect [his] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 416.929(b). Thus, the ALJ cannot rely solely upon the claimant's complaints to support the existence of an impairment.

Implicit in plaintiff's submission, is an argument that "new evidence" merits an award of benefits or a remand for further consideration. The Social Security Act provides for remand by the Court to allow further proceedings where new and material evidence exists, but only upon a showing of "good cause" for not presenting this evidence to the ALJ. 42 U.S.C. 405(g); *Matthews v. Apfel*, 239 F.3d 589 (3rd Cir. 2001).

To warrant such a new evidence remand, the plaintiff must show: (1) the evidence is "new" and not merely cumulative; (2) the evidence is material and there is a reasonable probability that the new evidence would have changed the outcome of the Commissioner's determination; (3) the evidence does not concern a later-acquired disability or subsequent deterioration of the previously non-disabling condition; and (4) there is "good cause" for not including the new evidence in the administrative record. *Szubak v. Sec'y of Health and Human Servs.*, 745 F.2d 831 (3rd Cir. 1984).

Therefore, the evidence must relate to the contested time period. In this case, that period is from January 15, 2009 through December 14, 2012. The new evidence cannot show a subsequently acquired disability or the deterioration of a condition that was not previous disabling.

Plaintiff argues that, up until the fall of 2014 when he was evaluated by mental healthcare providers at West Texas A&M University, all his mental healthcare providers mis-diagnosed him and all the records of the treatment provided by them fail to present an accurate picture of his

condition. Plaintiff submits a February 2, 2014 Psychological Evaluation[4] report prepared by Erin Avirett, Ph.D., as supervised by Timothy Atchison Ph.D., to support his claim of mis-diagnosis and inaccurate records, however, as the defendant notes, the February 2, 2014 Report is dated after the ALJ's decision and the Appeals Council's denial (Tr. 7). Plaintiff also submitted a "Medical Examination Report for Commercial Driver Fitness Examination," a CDL Report, showing that he was temporarily disqualified due to schizophrenia, shortness of breath, his vision test, and daytime sleepiness[5]. The denial is dated January 24, 2014. This CDL Report is also dated after the ALJ's decision and the Appeals Council's denial (Tr. 7).

Nothing in the record indicates plaintiff's new evidence relates to the time period under consideration. Because the new evidence has not been shown to be related to the time period under consideration, it cannot provide a basis for a new evidence remand. With respect to the CDL Report regarding his eyesight, plaintiff has not argued he asserted such impairment or suffered failing eyesight at the time of the ALJ hearing. Even if plaintiff were to now contend he suffered failing eyesight during the time period under consideration, he has not shown "good cause" for failing to assert it.

Other than his new evidence argument, plaintiff does not point to any error by the ALJ. In fact, plaintiff concedes in his September 29, 2014 reply brief there was no evidence to support his claim of mis-diagnosis until the fall of 2014.

Examination of the record shows the ALJ's determination is amply supported by the evidence of record. The ALJ discussed, weighed, and analyzed every medical report by every examining and

---

[4]Psychological Evaluation from West Texas A&M Univerity Counseling Services, attached to plaintiff's June 4, 2015 response.

[5]Plaintiff's "Medical Examination Report for Commercial Driver Fitness Determination" at page 2, attached to plaintiff's June 4, 2015 response.

consulting medical professional. The limitations determined by the ALJ tracked those assessed by the consulting medical professionals and his assessment of plaintiff's daily activities tracked that presented in plaintiff's own testimony. Plaintiff has not pointed to any evidence of record for the relevant time period which contradicts the ALJ's determination nor has he shown any error in the ALJ's reasoning. Lastly, and as mentioned previously, as to plaintiff's new evidence of other impairments, *i.e.*, mental health and eyesight, he has failed to show any of these impairments related to the time period covered by the challenged denial of benefits.

## V.
## RECOMMENDATION

For the reasons set forth above, it is the opinion and recommendation of the undersigned to the United States District Judge that the decision of the Commissioner finding plaintiff CHARLES HAYDEN ELDER was not disabled and not entitled to disability insurance benefits and social security insurance under Titles II and XVI of the Social Security Act be AFFIRMED.

## VI.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 1st day of September, 2015.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).